IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



| | |
|---|---|
| WINDY CITY METAL FABRICATORS & SUPPLY, INC., on Behalf of Itself and All Others Similarly Situated<br><br>Plaintiffs,<br><br>v.<br><br>CIT TECHNOLOGY FINANCING SERVICES, INC., and REED SMITH LLP, a New Jersey Limited Partnership<br><br>Defendants. | No. 05 C 5451<br><br>Wayne R. Andersen<br>District Judge |

## MEMORANDUM, OPINION AND ORDER

Before this Court are defendant CIT Technology Financing Services, Inc. ("CIT") and defendant Reed Smith LLP's ("Reed Smith") motions to dismiss in this matter. For the reasons set forth below, the defendants' motions to dismiss are granted.

### I. BACKGROUND

Plaintiffs Windy City Metal Fabricators & Supply, Inc. ("Windy City") and Midwest Ink Co. ("Midwest Ink"), in their second amended complaint, bring this action seeking compensatory, statutory and punitive damages against CIT and Reed Smith, alleging deceptive, unlawful and unfair business practices. Plaintiffs allege that Norvergence, a now-bankrupt company, sold and marketed a technology known as Matrix Hardware Unlimited Calling and High Speed Internet Access Solution ("Matrix Solution"), which purported to utilize software

and hardware that could only be leased through an Equipment Rental Agreement ("ERA") through Norvergence, yet consisted solely of re-labeled telecommunications devices manufactured by third parties and available to the general public. Norvergence marketed the Matrix Solution as an effective, and proprietary, manner of reducing overall telecommunications costs. In the instant case, Plaintiffs claim Norvergence promised it monthly savings of slightly over $300.

Norvergence bundled the Matrix Solution hardware with telecommunications services. The hardware was leased to Norvergence customers. To complete the Matrix Solution, Norvergence customers authorized Norvergence to act as their agent and change their telecommunications configurations and service providers. The total cost savings for telecommunications services was supposed to exceed the lease payments for the Matrix Solution hardware, thereby saving a Norvergence customer money.

After sales of Matrix Solution hardware, Norvergence would immediately assign or sell the ERA to CIT and other finance companies. Plaintiffs claim these transactions, while ostensibly between Norvergence and an independent leasing company, were actually designed to separate the leases from Norvergence so that Norvergence would receive an immediate benefit and CIT could attempt to enforce the leases notwithstanding Norvergence's fraud in the negotiation and execution of the leases. Plaintiffs posit that CIT knew that Norvergence was engaging in fraudulent transactions, yet nevertheless purchased Matrix Solution leases.

According to Plaintiffs, the Matrix System marketing plan was a "Ponzi" scheme. Norvergence would lure customers into buying its telecommunication hardware with the promise of cost savings on telecommunications services. Norvergence would then deliver its

customer telecommunications services at rates lower than it cost Norvergence to purchase or provide the services. Hence, according to Plaintiffs, the Matrix Solution was only sustainable as long as Norvergence could continue to sell hardware and immediately apply the proceeds of those sales to offset the true cost of telecommunications services.

On May 6, 2005, the Circuit Court of Sangamon County, Illinois, entered a default Final Judgment in the case of *Illinois ex. rel. Madigan v. Norvergence, Inc., et al.*, 2004 CH 655, Sangamon County, 7th Judicial Circuit (hereinafter the "*Attorney General Case*") declaring that all contracts between Norvergence and Illinois consumers or between finance companies and Illinois consumers stemming from solicitations for the Matrix Solution were the result of unfair practices and fraud on the part of Norvergence, and therefore were void *ab initio*. Neither CIT nor Reed Smith were party to the *Attorney General Case*.

Subsequent to the final judgment in the *Attorney General Case*, Reed Smith, acting on CIT's behalf, executed an Assurance of Voluntary Discontinuance ("Assurance") with the Attorneys General of several states, including Illinois. Pursuant to the Assurance, CIT agreed to, among other things, offer 85% discounts on the remaining balance of any leases relating to the ERAs, and refund 67% of the insurance-related charges paid on the ERAs. The Assurance dictated that CIT send a settlement letter, pre-approved by the Attorneys General party to the Assurance, outlining this offer to each of CIT's lessees. The pre-approved settlement letters included language disclosing the judgment in the *Attorney General Case* declaring the Matrix Solution contracts void *ab initio* and noting that CIT was not a party to that action.

As required by the Assurance, CIT sent a settlement letter directly to Plaintiffs. Shortly thereafter, law firm Reed Smith sent a letter to Plaintiffs' respective attorneys to ensure they were

3

aware of the letter. In this letter, Reed Smith offered to extend the period of the time the settlement offer was open. While Midwest Ink accepted the settlement on June 3, 2005, Windy City did not accept the settlement.

On August 26, 2005, Plaintiff Windy City filed a five-count class action complaint with this Court against defendants CIT and Reed Smith seeking disgorgement of monies received from supposedly unenforceable contracts ("Count One"), damages recoverable under the Uniform Deceptive Trade Practices Act, ("UDTPA"), 815 ILCS 510/2 *et seq.* ("Count Two"), the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFA"), 815 ILCS 505/2 *et seq.* ("Count Three"), and common law fraud ("Count Four") with a separate count seeking punitive damages ("Count Five").

On March 1, 2006, this Court dismissed without prejudice Count One for vagueness, Counts Two and Four through Six for failure to plead fraud with particularity, and Count Three for lack of damages. The Court granted leave to file an amended complaint, which was filed on April 27, 2006. On May 10, 2006, Windy City filed a revised second amended complaint ("Amended Complaint"), adding Midwest Ink as a plaintiff.

The Amended Complaint is an eight-count class action complaint against defendants CIT and Reed Smith. Count I of the Amended Complaint alleges a violation of the CFA. Count II is an assertion of the real defense of illegality. Count III is a claim for rescission. Count IV seeks a declaratory judgment that the ERAs are unenforceable under the CFA, the UDTPA, and the Uniform Commercial Code ("U.C.C."). Count V seeks punitive damages on the theory that Midwest Ink was damaged by Reed Smith's participation in the Assurance. Count VI alleges insurance fraud and seeks restitution for insurance premiums paid to CIT. Count VII seeks a

declaratory judgment that the Assurance is void *ab initio* under the CFA. Count VIII alleges common law fraud. On May 5, 2006, this Court denied Plaintiff's motion to certify class without prejudice.

The court now addresses defendants' motion to dismiss all counts of the Amended Complaint with prejudice. We accept all allegations set forth in plaintiffs' Amended Complaint as true in addressing the motions to dismiss before us.

## II. DISCUSSION

Pursuant to Federal Rule of Civil Procedure 12(b)(6), when deciding a motion to dismiss, this Court must assume the truth of all facts alleged in the complaint, construing the allegations liberally and viewing them in the light most favorable to the plaintiff. *Jones v. General Electric Co.*, 87 F.3d 209, 211 (7th Cir.1996); *Wilson v. Formigoni*, 42 F.3d 1060, 1062 (7th Cir.1994). However, the normally liberal pleading standards of the Federal Rules of Civil Procedure are heightened in this case by Rule 9(b), which requires a plaintiff to state with particularity "all averments of fraud or mistake." FED. R. CIV. P. 9(B). Pleading with particularity means that a plaintiff must include "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). In order to meet this heightened burden, a plaintiff must allege the "identity of the person who made the representation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Viacom Inc. v. Harthridge Merchant Svcs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994) (internal quotations and citations omitted).

This Court has previously dismissed substantially similar allegations in this case for

vagueness and failure to plead with particularity. For the following reasons, Counts I through VIII are dismissed, with prejudice.

## A. Failure to State a Claim

Essentially, the eight counts of the Amended Complaint argue that two separate frauds took place: (I) the initial scheme involving the ERA; and (ii) the offers made by CIT to settle outstanding lease payments on the ERA pursuant to the Assurance. Averments of fraud require particularity. As set forth above, this requires that a plaintiff plead who made the fraudulent statement, when the fraudulent statement was made, and how the fraudulent statement was communicated. *Viacom*, 20 F.3d at 777. The Amended Complaint fails to meet this pleading standard with regard to the first fraud it alleges, which involves CIT's involvement in the marketing and executing of the ERA.

1. CIT's involvement in Norvergence's ERA

While the Amended Complaint devotes an enormous amount of time to alleging fraud on the part of Norvergence, it has failed to establish CIT's connection to Norvergence beyond CIT's role as an assignee of Norvergence's ERAs. There are approximately eight major allegations in the Amended Complaint which attempt to link CIT with Norvergence, but all fail to do so with the requisite particularity.

a. Plaintiffs charge that CIT was jointly responsible with Norvergence for the acceptance

6

of the ERA. No evidence is offered to establish CIT's role in accepting the ERAs, or the time or place in which it did so.

b. Plaintiffs charge that CIT was aware of Norvergence's deceitful and fraudulent practices because it received many complaints about Norvergence. No evidence, however, is offered to establish the content, time, or author of such complaints.

c. Plaintiffs charge that CIT should have known that the ERA was for a bundled service and equipment lease agreement, and therefore was fraudulent. No evidence, however, is offered to establish who at CIT knew that the assigned ERA was for a bundled service and equipment lease agreement, or name the individuals who should have known, when they would have known, or how they would have known.

d. Plaintiffs charge that CIT retained a third party to perform a due diligence analysis of Norvergence and its products. No evidence is offered as to the date, time, or location of this due diligence. Additionally, plaintiffs charge that the third party was instructed to perform the due diligence based on the value of the ERAs should Norvergence file bankruptcy. No evidence is offered to show who instructed the third party, and in what manner.

e. Plaintiffs charge that through the insurance that was charged on the ERA by Norvergence, CIT either falsely inflated the value of the equipment of the ERA, knew the value of the ERA, or falsely stated the insurance charges. Except for an exhibit showing that there were insurance charges on the ERA, no evidence is presented to show the CIT played any part in establishing the insurance charges, or that CIT had any knowledge that the insurance charges were false.

f. Plaintiffs charge that CIT represented to plaintiffs that plaintiffs would receive deeply

7

discounted telecommunications services in order to entice plaintiffs to sign the ERAs. No evidence has been presented to establish that CIT had any contact with plaintiffs prior to the assigning of their ERAs.

g. Plaintiffs charge that CIT was "fully aware" of Norvergence's misrepresentations about the ERAs, yet bought and enforced the ERAs. As noted above, no evidence is offered to establish who at CIT was aware that Norvergence was fraudulently misrepresenting the ERA.

h. Plaintiffs charge that CIT utilized deceptive and unfair practices for the purposes of inducing plaintiffs into entering the ERA. As noted above, no evidence has been presented to establish that CIT had any contact with plaintiffs prior to the assigning of their ERAs.

2. CIT's Settlement Offer

The second fraud Plaintiffs set forth involves the Assurance, CIT's efforts to settle the ERAs. Plaintiffs allege that because the ERA is fraudulent, the Assurance is likewise fraudulent, and should be declared unenforceable.

Common law fraud, the CFA, and UDTPA all require a that a plaintiff sustain damages. *Miller v. William Chevrolet/GEO, Inc.*, 326 Ill.App.3d 642, 652 (Ill.App. 1st Dist. 2001) ("damages are a necessary element of the *prima facie* case for both plaintiff's common law and statutory consumer fraud claims"). To state a claim under the CFA, Plaintiffs must show that the alleged fraud proximately caused its damages. *Oliveira v. Amoco Oil Co.*, 201 Ill.2d 134, 140 (Ill. 2002). Common law fraud requires damages stemming from reliance on a fraudulent statement. *Connick v. Suzuki Motor Co.*, 174 Ill.2d 482, 496 (Ill. 1996).

8

It is questionable whether the UDTPA even applies. *See, e.g.*, 815 ILCS 510/2 ("(c) This Section does not affect unfair trade practices otherwise actionable at common law or under other statutes of this State."). However, in the event the UDTPA does apply, damages are a prerequisite. *Greisz v. Household Bank*, 176 F.3d 1012, 1016 (7th Cir. 1999) ("The state-law claims [including the UDTPA] failed for a variety of reasons, most clearly because of the plaintiff's failure to establish any damages for which relief can be obtained under the Illinois laws that she is suing upon.")

Plaintiff Windy City's claim that the Assurance was fraudulent because it was based on an unenforceable ERA was originally dismissed on March 1, 2006 because Windy City had not accepted CIT's settlement offer and therefore had not relied upon the representations made in the settlement offer to its detriment. Windy City had suffered no damages from the representations made in the settlement offer, even assuming they were fraudulent.

In the Amended Complaint, the Court is presented with another plaintiff, Midwest Ink, that did accept the settlement offer. The Court will therefore examine this issue in the context of Midwest Ink's acceptance of the Settlement Agreement.

a. Midwest Ink

Midwest Ink entered into the Assurance with CIT on June 3, 2005. The terms of the Assurance stated:

> By accepting this proposal, you (a) elect and agree to pay the Settlement Balance; and (b) fully release CIT from, and agree not to sue CIT for, any and all claims that you have or may have had against CIT relating to your Rental

9

Agreement or any other matter arising from your dealings with Norvergence, including any such claims you may have as a member or representative of various proposed class action lawsuits that have been brought against CIT on behalf of asserted classes of Norvergence customers (as well as any such proposed class action lawsuits that may be brought in the future. If you are currently involved in any litigation with CIT over your Rental Agreement and you wish to participate in the Settlement Program, you and CIT will mutually dismiss that action with prejudice.

CIT, in turn, will fully release you from, and agree not to sue you for or to dismiss you from, any and all claims that it has or may have had against you based on your Rental Agreement. Both you and CIT will retain all rights under law to enforce the Release.

Plaintiffs charge that the Settlement Agreement is an attempt to defraud plaintiffs because the underlying transaction, the ERA, is void *ab initio,* and in fact conceals the fact that an Illinois court had declared the ERAs void *ab initio.* The plaintiffs do not deny that Midwest Ink's balance under the ERA was $12,632.34 on its ERA, and that the Settlement Agreement reduced that amount to $1,253.38.

"A settlement agreement is a contract and as such, the construction and enforcement of settlement agreements are governed by principles of local law applicable to contracts generally." *Laserage Tech. Corp. v. Laserage Labs., Inc.,* 972 F.2d 799, 802 (7th Cir. 1992), quoting *Air Line Stewards and Stewardesses Assoc. v. Trans World Airlines, Inc.,* 713 F.2d 319, 321 (7th Cir.1983). In interpreting a contract under Illinois law, "the paramount objective is to give effect to the intent of the parties as expressed by the terms of the agreement." *Int'l Minerals & Chem. Corp. v. Liberty Mutual Ins. Co.,* 168 Ill.App.3d 361, 119 Ill.Dec. 96, 102, 522 N.E.2d 758, 764 (1988).

Additionally, a release is a contract, and "its construction is governed by the rules of law

that prevail in contract cases." *Havoco of Am., Ltd. V. Sumitomo Corp. Of Am.*, 971 F.2d 1332,

1341 (7th Cir. 1992), quoting *Ainsworth Corp. v. Cenco, Inc.*, 107 Ill.App.3d 435, 63 Ill.Dec.

168, 172, 437 N.E.2d 817, 821 (1982). As with any contract, "[a] release may be set aside if

there is fraud in the inducement." *Phil Dressler & Assoc. v. Old Oak Brook Inv. Corp.*, 192

Ill.App.3d 577, 139 Ill.Dec. 629, 633, 548 N.E.2d 1343, 1347 (1989). The elements of

fraudulent inducement, are: "(1) a false statement of material fact; (2) known or believed to be

false by the person making it; (3) an intent to induce the other party to act; (4) action by the other

party in reliance on the truth of the statement; and (5) damage to the other party resulting from

such reliance." *Havoco of Am.*, 971 F.2d at 1341, quoting *Cotter v. Parrish*, 166 Ill.App.3d 836,

117 Ill.Dec. 821, 824, 520 N.E.2d 1172, 1175 (1988).

Midwest Ink entered into the Settlement Agreement after a well publicized Illinois Attorney General case and with knowledge that the Settlement Agreement was pursuant to an agreement with the Attorney General of the State of Illinois regarding its ERA with Norvergence. Midwest Ink acknowledged and represented that it had the opportunity to have the Settlement Agreement examined by an attorney, that it was entering into the Settlement Agreement voluntarily, and that no representations or promises about the Settlement Agreement had been made. Regardless of the above, plaintiffs argue that the Settlement Agreement should be overturned because it was based upon fraud.

The first element of fraudulent enticement requires a false statement of material fact. Midwest Ink has not pointed to any evidence that the Settlement Agreement contains any false statements of material fact. Midwest Ink has not pointed to any specific facts at all, which are required by the heightened pleading standard of fraud under Rule 9(b), which even allege that the

11

Settlement Agreement contains false statements of material fact. The face of the Settlement Agreement acknowledged that the agreement was pursuant to an Agreement with the Attorney General of Illinois, and was for the purpose of settling any and all disputes between Midwest Ink and CIT. In addition, Midwest Ink points to its damages in signing the Settlement Agreement as evidence that it relied to its detriment on the Settlement Agreement, yet acknowledges that its total amount owed under the ERA was reduced by more than 85% as a result of the Assurance. Because Midwest Ink has not shown with the requisite particularity that it was induced by fraudulent conduct into participating in the Settlement Agreement, this claim also fails.

Counts I through IV and VI through VIII are dismissed with prejudice. Plaintiffs have failed to plead with the requisite particularity that CIT played a part in the initial scheme involving the ERA or that the offers made by CIT to settle outstanding lease payments on the ERA pursuant to the Assurance were fraudulent. As set forth above, pleading with particularity requires that a plaintiff plead who made the fraudulent statement, when the fraudulent statement was made, and how the fraudulent statement was communicated. *Viacom*, 20 F.3d at 777. These elements have not been met by plaintiffs. Therefore, Counts I through IV and VI through VIII, all of which rely upon averments of fraud, are dismissed.

b. Reed Smith

The basis of plaintiffs' claim against law firm Reed Smith is that (1) it negotiated the Assurance between CIT and the Illinois Attorney General in an attempt to mislead consumers; and (2) it violated Rule 4.2 of the Rules of Professional Responsibility by contacting plaintiffs

12

directly, rather than through their respective attorneys. In its Amended Complaint, however, plaintiffs fail to establish with the requisite particularity that Reed Smith was fraudulent in negotiating the Assurance or that the Attorney General was fraudulent in negotiating the Assurance. Hence, this claim fails.

The Assurance, which plaintiffs provide as evidence, clearly states that CIT must provide a settlement letter to CIT customers with Norvergence ERAs within 30 days of the Assurance. CIT complied with the terms of this requirement. Furthermore, it is far from evident that at the time the proposed Settlement Agreements were mailed to plaintiffs that either plaintiff was represented by attorneys, and even less clear that CIT would have been aware of the representation because neither party had brought any action against CIT, or even Norvergence, at that time. As a result, it hardly seems evident that Reed Smith's actions were designed to circumvent or undermine the Rules of Professional Responsibility. Here, plaintiffs' claim also fails, and Count V is dismissed.

### III. CONCLUSION

Counts I through VIII of the Revised Second Amended Complaint are dismissed with prejudice. As to Counts I through IV and VI through VII, Plaintiffs have not stated a claim for fraud because they have failed to plead with the requisite particularity that CIT was complicit in the ERA between the plaintiffs and Norvergence. As to Count V, Plaintiffs have not stated a claim for fraud because they have failed to plead with the requisite particularity Reed Smith's fraudulence regarding the Attorney General's Settlement Agreement.

For the foregoing reasons, Plaintiff has failed to state a claim upon which relief can be granted. We grant defendant CIT's motion to dismiss [82] and defendant Reed Smith's motion to dismiss [85], with prejudice. This case is hereby terminated.

It is so ordered.

Wayne R. Andersen
United States District Court

Dated: February 9, 2007